UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DANA OBERHANSLY,

       Plaintiff,

                                          CASE NO. 1:15-CV-73

v.

                                          HON. PAUL L. MALONEY

ASSOCIATION OF BETTER LIVING AND
EDUCATION INTERNATIONAL, et al.,

       Defendants.

_____/

## OPINION

       Plaintiff brings an action in diversity under 28 U.S.C. § 1332, alleging breach of contract,

negligence, fraud, and premises liability.  (ECF No. 1.)  Defendant Narconon Freedom Center

("NFC") brings a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 16.)

Defendant Narconon Eastern United States ("Eastern") joins NFC's motion to dismiss, and also

raises an argument for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[1]

(ECF No. 18.)  Upon careful review of the record, the Court has decided that the motion can be

resolved without oral argument.  *See* W.D. Mich. LCivR 7.3(d).  For the reasons that follow,

Defendants' motions are granted.

## I.

       Plaintiff Dana Oberhansly, an Arizona resident, sought treatment for her drug addiction from

---

[1] Defendants NFC and Eastern are the only remaining known defendants.  Defendants Association of Better Living and Education International and Narconon International were terminated on May 20, 2015. (ECF No. 17.)  Plaintiff also lists unknown parties, named Does 1-100 and Roe Corporations I-X inclusive, in her complaint.

NFC in Albion, Michigan. In April 2013, Plaintiff contacted NFC through their website. She spoke with an intake counselor who described NFC's facility and drug-addiction program. During the conversation, the intake counselor explained that NFC's facilities were very nice, and that she would be able to receive massages, exercise, and use a hot tub to help with her withdrawals. The intake counselor also informed her that her first week in the withdrawal unit would be comfortable and monitored by health care professionals. The intake counselor explained that the sauna portion would help her body detox by sweating out toxins to rid her body of residual drugs in her fat cells. The intake counselor also told her that the program would address her addiction and the problems associated with it, and that she would be monitored by health care professionals and work with trained counselors during the course of the program.

The intake counselor offered to pay for half of Plaintiff's flight to Michigan because she could not afford the travel cost and entrance fees up front. He also told Plaintiff that she should come immediately to the facility to begin treatment as soon as possible because her addiction was a matter of life or death. Three days later, Plaintiff traveled to Michigan to enroll in NFC's drug-treatment program. The week before she left for Michigan, Plaintiff abused drugs heavily and continued to do so until she landed in Michigan. In fact, she was still high when she first arrived at NFC. During the flight to Michigan, Plaintiff admits to using cocaine, ecstasy, and ketamine.

Upon arrival at NFC, Plaintiff signed and initialed each page of NFC's admission agreement, which describes the nature of the treatment program and its cost:

> NARCONON FREEDOM CENTER, INC. (FREEDOM CENTER) drug and alcohol rehabilitation program has an excellent success rate for students who actively and honestly participate in and complete the entire program. Our program is designed to achieve this positive result with specific program steps and procedures, in a gradient found to be most workable and successful based on 40 years of experience in treating

chemical dependency.

> Freedom Center delivers a comprehensive drug and alcohol treatment program using the Narconon program methodology. This methodology was written and developed by founder William Benitez. This is based on the client's (called students) completion of established, results-oriented treatment goals, as opposed to a set number of days or weeks in treatment. The amount of time it takes each individual to complete the program varies, but should average between three and six months.

(Def.'s Mot. to Dismiss Ex. A, ECF No. 16-2, PageID.254.) The signed agreement also

contains an arbitration provision:

> The parties agree that any controversy, dispute or claim arising out of or relating to or involving this Admission Agreement shall be resolved by binding arbitration. Those claims subject to arbitration include but are not limited to any and all disputes or controversy regarding services provided, conditions at the Freedom Center facility, the staff, the results of the program, other student's actions, claims of discrimination, consumer complaints or any other cause of action.

(*Id.* at PageID.266.)

NFC's website indicated a high success rate, ranging from 70-82% for those who completed

Narconon's program. But the website and the information provided by the intake counselor did not

indicate that NFC had any affiliation with Scientology, and never explained that the treatment

program was based on Scientology. The website simply indicated that the program was developed

by L. Ron Hubbard. The signed admission agreement also does not reference Scientology.

When Plaintiff arrived at the facility, she was strip-searched by the staff and drug tested. She

alleges that she entered the withdrawal portion of the program for seven days, and suffered

withdrawals without the comfort measures that she was promised and without the supervision of

trained health care professionals. She also alleges that the counselors were not trained professionals.

Rather, they were individuals who had completed NFC's program themselves, some only a few

weeks before beginning to work as a counselor. The website also advertised around-the-clock

medical staffing, but Plaintiff only saw a doctor once a week and the remainder of the time, a single registered nurse was present. During Plaintiff's time in the withdrawal unit, the counselors periodically checked her heart rate and blood pressure, and provided her with vitamin bombs.

After a week in the withdrawal unit, Plaintiff moved across the hall. NFC's facility was dilapidated; it did not look like the website's pictures or as the intake counselor had described. During Plaintiff's stay at NFC, the water in the women's wing was shut off for over two weeks. There was also a lack of hot water in the kitchen, and the Calhoun County Health Department cited NFC for several health code violations while Plaintiff was a patient. At one point, the Health Department shut down the kitchen for over a week. There was also a rampant bed-bug infestation in the facility.

In addition, Plaintiff did not receive counseling as advertised; the counselors were former graduates of the program, without any specialized training, knowledge, or expertise. At one point, a counselor was removed for abusing drugs. Based on the website and her conversation with the intake counselor, Plaintiff believed that she would undergo therapy to help her deal with her addiction. Instead, she received exercises based on Scientology teachings. Rather than receiving medically-recognized substance abuse therapy, patients adhered to a program of studying eight books written by L. Ron Hubbard, known as "technology" or "study technology" to Scientologists. The program included drills or exercises routinely used in Scientology. Instead of meeting with a counselor or drug-therapy specialist, Plaintiff engaged in these drills. The activities had no apparent connection to the treatment of substance abuse, and often lasted for hours at a time.

During her stay at NFC, Plaintiff also feared for her safety. Other patients threatened violence against her, and NFC's staff simply told the other patients not to approach Plaintiff or talk

to her.

The detoxification or sauna portion of the program was a Scientology ritual known as the "Purification Rundown." Patients first exercise vigorously, then ingest increased doses of Niacin and a vitamin bomb before entering the sauna for six hours a day. NFC requires all patients to spend six hours a day for five weeks in the sauna, and Plaintiff spent approximately 27 days in the sauna program. During this time, Plaintiff had an adverse reaction to the sauna and Niacin treatments, but she continued with the program. Patients were given a small amount of water and vegetables during their time in the sauna, but the vegetables often had mold. Several times, sewage backed up through the drains in the floor of the sauna. During the sauna treatments, there were no medical personnel available to oversee the health and safety of the patients. There was one sauna supervisor, who sat outside of the sauna area while the patients were inside. The sauna supervisor did not have any medical or specialized training, but rather served as a policing force to ensure that patients complied with the program. The claims about the benefits of NFC's sauna program are not scientifically proven, and there is no scientific evidence for the claim that the residual drug toxins stored in fatty tissue leak into the bloodstream and cause drug cravings. The sauna program also exposes patients to serious health risks including severe dehydration.

Plaintiff completed NFC's drug-treatment program, but had difficulty adjusting to normal life afterward and relapsed. She brings an action in diversity against Defendants, alleging (1) breach of contract; (2) negligence; (3) fraud; and (4) premises liability. Defendant NFC argues that the signed admission agreement's arbitration clause controls, so the Court should dismiss Plaintiff's complaint under Rule 12(b)(6). Defendant Eastern joins NFC's motion and also argues, in the alternative, that the Court lacks personal jurisdiction.

## II.

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 335 U.S. 41, 47 (1957)). Although a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has now 'show[n]'– that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In ruling on a Rule 12(b)(6) motion to dismiss, the Court may only consider "the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Plaintiff also raises a claim for fraud. Federal Rule of Civil Procedure 9(b) requires

particularity when pleading fraud. *Iqbal*, 556 U.S. at 686 (discussing the elevated Rule 9(b) pleading standard). In other words, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omincare, Inc.*, 583 F.3d 935, 942-43 (6th Cir. 2009) (citation and quotations omitted).

In addition, the party must identify the "alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of [the other party]; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993) (quotation marks and citations omitted). But "[w]hen faced with a motion to dismiss for failure to plead fraud 'with particularity' as required by Rule 9(b) . . . , 'a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 9.'" *Whalen v. Stryker Corp.*, 783 F. Supp. 2d 977, 982 (E.D. Ky. 2011) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988)). "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8." *United States ex. rel Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007) (quoting *Michaels*, 848 F.2d at 679). "The threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentation allowing the defendants to answer, addressing in an informed way plaintiff[']s claim of fraud." *Coffey*, 2 F.3d at 162 (quotation marks omitted).

# III.

## A. Contract Formation

As a general rule, the enforceability of an arbitration clause depends on the validity of the contract in which it is contained. *High v. Capital Senior Living Properties 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789, 797 (E.D. Mich. 2008). This basic requirement—the existence of an actual agreement to arbitrate—is the first of several determinations a district court must make before compelling arbitration. *Id*

In Michigan, "the elements of a valid contract are (1) parties competent to enter into a contract; (2) a proper subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation." *Id.* "'In order to form a valid contract, there must be a meeting of the minds on all the material facts.'" *Id.* (quoting *Kamalnath v. Mercy Memorial Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992)). In other words, there must be mutual assent to the material facts. *Id.* (citing *Kamalnath*, 487 N.W.2d at 503). A contract is made when both parties have executed or accepted it, and not before. *Id.*

The party seeking to enforce the contract has the burden of showing the existence of the contract. *Id.* Michigan law permits an inference that an offeree has accepted the terms of the agreement when she signals her assent through conduct, even if the agreement is unsigned. *Id.* (citing *Pakideh v. Franklin Commercial Mortg. Grp., Inc.*, 540 N.W.2d 777, 780 (Mich. Ct. App. 1995) ("If an offer does not require a specific form of acceptance, acceptance may be implied by the offeree's conduct.")).

## 1. Competency

Defendants argue that Plaintiff is bound by the terms of the admission agreement, which includes an arbitration provision. Defendants attach a copy of Plaintiff's agreement to their motion.[2] Plaintiff argues that she was not competent to enter into a contract because she was high when she arrived in Michigan, and had heavily used drugs the week before her arrival.

The legal definition for competency is "the mental ability to understand problems and make decisions." BLACK'S LAW DICTIONARY (10th ed. 2014). Parties to an agreement are presumed to have full legal capacity to contract unless they are under guardianship, an infant, mentally ill or defective, or intoxicated. *See* Restatement (Second) of Contracts § 12(2) (1981). The contract is valid unless the mental disability is so extreme that an individual cannot form the necessary intent. *Id.* at § 15 cmt. c.

In any case, the burden of proof for incompetency is on the party asserting it. *Id.* A person incurs only voidable contractual duties by entering into a transaction if the other party has reason to know that due to intoxication (a) she is unable to understand in a reasonable manner the nature and consequences of the transaction, or (b) she is unable to act in a reasonable manner in relation to the transaction. Restatement (Second) of Contracts § 16 (1981). The standard for competency in intoxication cases is the same as that in cases of mental illness. *Id.* at cmt. b. If a person's

---

[2] Plaintiff alleges breach of contract, but she did not attach the admission agreement to the complaint. However, she alleges that NFC's treatment constituted a breach of "a Contract whereby Defendants agreed, in exchange for consideration, to provide secular, residential drug and alcohol treatment to Plaintiff." (Compl. ¶¶ 156-57, ECF No. 1, PageID.19.) Because Plaintiff referenced and relied upon the agreement in her complaint, the Court may consider this exhibit without converting the motion into one under Rule 56. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) *abrogated on other grounds by In re Fair Finance Co. v. Textron Financial Corp.*, 834 F.3d 651 (6th Cir. 2016).

drunkenness is so extreme as to prevent any manifestation of assent, there is no capacity to contract. *Id.* at cmt. a (citing §§ 2, 12, 19). Elements of overreaching or other unfair advantage may be relevant on the issues of competency, of the other party's reason to know, and of the appropriate remedy. *Id.* Where there is some understanding of the transaction despite intoxication, avoidance depends on showing that the other party induced the drunkenness or that the consideration was inadequate or that the transaction departed from the normal pattern of similar transactions. *Id.* at cmt. b.

Taking Plaintiff's allegations in the complaint as true, she arrived at NFC high on cocaine, ecstasy, and ketamine. (Compl. 6, ECF No. 1, PageID.6.) Prior to signing the agreement, Plaintiff had visited NFC's website, spoken with an intake counselor, purchased a plane ticket, and traveled to Michigan to participate in the program. But in the week before she left for Michigan, she was abusing drugs heavily. (*Id.*)

A contract entered into by a person who is so drunk as not to know what she is doing is voidable only, and not void, and may therefore be ratified by her when she becomes sober. *Carpenter v. Rogers*, 28 N.W. 156, 157 (Mich. 1886). Plaintiff stayed at NFC's facility and completed the program. She went through a week-long detoxification process, and during that time, she became sober. She also continued the sauna program for twenty-seven days while maintaining her sobriety. For over a month, she chose to remain at the facility, despite the dilapidated conditions, untrained counselors, and the other allegations in her complaint. Even if she had been too intoxicated to know what she was doing when she signed the admission agreement, she nonetheless ratified the contract by her conduct when she became sober and chose to stay at the facility to complete the program.

**B. Mutuality of agreement**

Plaintiff also contends that there was no mutuality of agreement because of fraud in the factum. (Pl.'s Resp. 6, ECF No. 21, PageID.306.) "Essentially, fraud in the factum means there never was a contract, because there never was mutual assent between the parties, so the contract is void ab initio." *Morris v. Homeowners Loan Corp.*, No. 06-cv-1384-DT, 2007 WL 674770, at *4 (E.D. Mich. Feb. 28, 2007) (citing Restatement (Second) of Contracts § 163 (1981)). It exists where "a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract[.]" *Id.*

The most common assent to a contract is well known: "[g]enerally 'one who signs a contract which she has had an opportunity to read and understand is bound by its provisions.'" *Morris*, 2007 WL 674770, at *5 (quoting *DeOrnellas v. Aspen Square Mgmt., Inc.*, 295 F. Supp. 2d 753, 764 (E.D. Mich. 2003)). Thus, "'the failure to read or understand an agreement is not cause for avoiding same.'" *Id.* (quoting *Carpenter v. Am. Excelsior Co.*, 650 F. Supp. 933, 937 (E.D. Mich. 1987)). Plaintiff initialed each page of the agreement and signed the final page. She had an opportunity to read and understand the agreement, so she is bound by its provisions.

In the complaint, Plaintiff alleges several promises from NFC's website and an intake counselor. Specifically, she alleges that she was told that the facilities were very nice, and that she would be able to receive massages, use exercise equipment, and a hot tub. She alleges that the intake counselor "reinforced the claims made through the website[ ] of . . . NFC to justify Plaintiff traveling from Arizona to Michigan. This was done to make it appear as though Plaintiff would be going to a nice rehabilitation facility that would be worth her time and money." (Compl. 4, ECF No. 1,

PageID.4.)  She also alleges that the intake counselor told her that "her first week in the withdrawal unit would be comfortable and monitored by health care professionals and real counselors."  (*Id.* at PageID.5.)   He also told her that "the sauna portion would help her detox by sweating out the toxins . . . [to] help Plaintiff rid her body of residual drugs in her fat cells . . . [which] would be monitored by professionals." (*Id.*)   The intake counselor further informed her that the program "would address her addiction and the problems associated with it.  She was told that she would be overseen by real health care professionals and real counselors."  (*Id.*)  The website and the intake counselor indicated a high rate of success, ranging from 70-82%, for those who completed the program.  (*Id.*)  Plaintiff explains that she "suffered through the extremes of her withdrawal and without the comfort measures she was promised." (*Id.* at PageID.7.)  Nor was she provided with the trained health care professionals or the around-the-clock medical staffing that she was promised. (*Id.*)

Additionally, the information provided by the website and the intake counselor "did not indicate any relationship with Scientology, and never stated that program was based on Scientology, only that it was developed by L. Ron Hubbard."  (*Id.*)   Rather, the website explained that their program is an "entirely drug-free social education program." (*Id.*)

Plaintiff alleges that Defendants knowingly promised Plaintiff that she would receive effective and scientifically proven counseling for her substance abuse, that the program was secular and did not involve the study or practice of any religion, that the sauna program was safe and scientifically proven as effective, and that she would go through a safe, medical detox with professional supervision.  (*Id.* at PageID.21.)  She alleges that the statements were made on NFC's website, and she includes screen captures of the website as exhibits to her response.  She also alleges

that Joe, the intake counselor that she spoke with, further made these fraudulent representations, and that Defendants made these statements with the intent to induce new patients to enroll in the program.

Despite Plaintiff's contentions that there was no meeting of the minds, she alleges a breach of contract cause of action in her complaint. She explains that "Plaintiffs and Defendants were bound by a [c]ontract whereby Defendants agreed, in exchange for consideration, to provide secular, residential drug, and alcohol treatment to Plaintiff." (*Id.* at PageID.19.) She further alleges that she ". . . contracted and sought treatment with Defendant NFC[.]" (*Id.*) Plaintiff cannot then defend a Rule 12(b)(6) motion by arguing that the contract was not valid. *See Ferguson v. Neighborhood Housing Servs.*, 780 F.2d 549, 551 (6th Cir. 1986) ("[U]nder federal law, stipulations and admissions in pleadings are generally binding on the parties and the Court.") (internal citations and quotations omitted); *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.") (citing *White v. ARCO/ Polymers, Inc.*, 720 F.3d 1391, 1396 (5th Cir. 1983)). Plaintiff's argument is unconvincing; she cannot have it both ways. Thus, in light of the complaint's allegations, Plaintiff and NFC formed a valid contract.

### C. Contract is not unconscionable or unenforceable

Plaintiff also argues that the contract and arbitration clause are unconscionable and unenforceable. (Pl.'s Resp. 7, ECF No. 21, PageID.307.) Michigan law suggests that, in order for the contract to be considered unconscionable, both procedural and substantive unconscionability must be present. *High*, 594 F. Supp. 2d at 799 (citing *Clark v. DaimlerChrysler Corp.*, 706 N.W.2d 471, 474-75 (Mich. Ct. App. 2005)). Procedural unconscionability exists where the weaker party

has no realistic alternative to acceptance of the term. *Id.* (citing *Clark*, 706 N.W.2d at 475).

Procedural unconscionability is present where the challenged provision is buried in the text of a

document, appears in small font, or is not otherwise conspicuous. *Id.* (citing *Krupp PM Eng'g, Inc.*

*v. Honeywell, Inc.*, 530 N.W.2d 146, 149 (Mich. Ct. App. 1995)). Determining procedural

unconscionability requires the Court to focus on the "real and voluntary meeting of the minds" of

the parties at the time that the contract was executed and consider factors such as: "(1) relative

bargaining power; (2) age; (3) education; (4) intelligence; (5) business savvy and experience;

(6) drafter of the contract; and (7) whether the terms were explained to the 'weaker' party." *Id.*

(quoting *Johnson v. Mobil Oil Corp.*, 415 F. Supp. 264, 266 (E.D. Mich. 1976)).

In addition, a party seeking to compel arbitration must also show that the other party waived

her right to a jury trial. *Id.* (citing *Cooper v. MRM Invest. Co.*, 367 F.3d 493, 507 (6th Cir. 2004)

(observing that "[i]f the claims are properly before an arbitral forum pursuant to an arbitration

agreement, the jury trial right vanishes")). The Court must determine whether the jury-trial waiver

was knowing and voluntary. *Id.* (citing *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th

Cir. 2003)). In evaluating whether a waiver has been knowingly and voluntarily executed, the Court

looks at:

> (1) plaintiff's experience, background, and education; (2) the amount of time the
> plaintiff had to consider whether to sign the waiver, including whether the [plaintiff]
> had an opportunity to consult with a lawyer; (3) the clarity of the waiver;
> (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Id.* (quoting *Morrison*, 317 F.3d at 668). Where there is a clear, express waiver of the right to a jury

trial, the party seeking to avoid that waiver must demonstrate that she did not knowingly and

voluntarily agree to the provision. *Id.* (citing *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752,

755 (6th Cir. 1985)).

When Plaintiff signed the admission agreement, she was 23 years old "with some post-secondary education, of average intelligence." (Pl.'s Resp. 9, ECF No. 21, PageID.309.) Although Plaintiff did not have "business savvy or experience", *id.*, or an opportunity to consult with a lawyer, the waiver was clear: "[t]he parties agree that any controversy, dispute or claim arising out of or relating to or involving this Admission Agreement shall be resolved by binding arbitration." (ECF No. 16-2, PageID.266.) To rebut the clear waiver, Plaintiff argues that, because she was intoxicated and a drug addict when she signed the contract, that she did not knowingly and voluntarily waive a jury trial. (Pl.'s Resp. 9, ECF No. 21, PageID.309.) But Plaintiff initialed the page with the arbitration agreement. And, as discussed *infra*, she also raised a breach of contract claim in her complaint. Thus, Plaintiff knowingly and voluntarily waived her right to a jury trial when she signed the agreement. There was no procedural unconscionability; so the contract is valid and enforceable.

### D. Arbitration clause

"As a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) (citing *Moses H. Cone Mem. Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24-25 (1983)). "[T]here is a general presumption of arbitrability, and any doubts are to be resolved in favor of arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (quoting *Highlands Wellmont Health Network, Inc. v. John Deer Health Plan, Inc.*, 350 F.3d 568, 576-77 (6th Cir. 2003) (internal quotation omitted)).

In cases with broad arbitration clauses, "the [Supreme] Court has found the presumption of

arbitrability particularly applicable, and only an express provision excluding a particular grievance from arbitration or the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Techs. v. Commc'ns Workers*, 475 U.S. 643, 650 (1986). Here, the arbitration clause in the admission agreement indicates that:

> [t]he parties agree that any controversy, dispute or claim arising out of or relating to or involving this Admission Agreement shall be resolved by binding arbitration. Those claims subject to arbitration include but are not limited to any and all disputes or controversy regarding services provided, conditions at the Freedom Center facility, the staff, the results of the program, other student's actions, claims of discrimination, consumer complaints or any other cause of action.

(Def.'s Mot. to Dismiss Ex. A, ECF No. 16-2, PageID.266.) This is a broad provision, and in light of the presumption of arbitrability, it applies to all of Plaintiff's causes of action. First, the breach of contract claim arises from this agreement itself, so the arbitration clause plainly applies. In addition, Plaintiff's claims for negligence, fraud, and premises liability relate to the conditions at the facility, the staff, and the program results, all of which are explicitly listed in the arbitration clause. Thus, the allegations in Plaintiff's complaint are subject to arbitration.

**II. The Court lacks personal jurisdiction over Defendant Eastern**

Defendant Eastern joins NFC's motion to dismiss, but also asserts in the alternative, that the Court lacks personal jurisdiction over it. "A federal court may not assume jurisdiction to decide the merits of a dispute; it must satisfy itself in the first instance that it has jurisdiction over the parties and the subject matter." *Miami Valley Fair Housing Ctr., Inc. v. Steiner & Assocs., Inc.*, 483 F. App'x 67, 70 (6th Cir. 2012). The Court must first determine whether it has personal jurisdiction over Eastern before addressing the merits of its Rule 12(b)(6) motion to dismiss. When the issue of lack of personal jurisdiction is raised, the plaintiff bears the burden of establishing that the court

has personal jurisdiction over the defendant. *Beydoun v. Wataniya Rest. Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014).

The Court has three options for ruling on a motion to dismiss for lack of personal jurisdiction, it may: (1) "decide the motion upon the affidavits alone"; (2) "permit discovery in aid of deciding the motion"; or (3) "conduct an evidentiary hearing to resolve any apparent factual questions." *Theunissen v. Matthews*, 935 F.3d 1454, 1458 (6th Cir. 1991). In response to a motion to dismiss, "the plaintiff must make only a *prima facie* showing that personal jurisdiction exists." *Id.* Regardless of the method employed to rule on the motion, the plaintiff cannot "rest on his pleadings to answer the movant's affidavits, but must set forth, by affidavit or otherwise[,] . . . specific facts showing the court has jurisdiction." *Id.* (quotation omitted).

When ruling on such a motion without conducting an evidentiary hearing, the Court must consider the pleadings and affidavits in the light most favorable to the non-moving party. *Beydoun*, 768 F.3d at 504. The existence of contradicting evidence may be enough for Plaintiff to make a *prima facie* showing of personal jurisdiction. *See Yoost v. Caspari*, 813 N.W.2d 783, 791 (Mich. Ct. App. 2012) (citing *Williams v. Bowman Livestock Equip., Co.*, 927 F.2d 1128, 1130-31 (10th Cir. 1991)). Nevertheless, the Court may accept as true Defendant's uncontroverted factual assertions, provided that they are "consistent with the representations of the plaintiff." *Kerry Steel, Inc. v. Pargon Indus., Inc.*, 106 F.3d 147, 153 (6th Cir. 1997).

In a diversity action, the Court must apply the law of the forum state to determine whether personal jurisdiction exists. *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012) (quoting *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F. 3d 790, 793 (6th Cir. 1996)). In Michigan, two requirements must be satisfied: the State's long-arm statute and constitutional due

process. *Id.* (citing *Air Prods.*, 503 F.3d at 550); *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319-20 (1945). Due process concerns are governed by the standard articulated in *International Shoe* and its progeny: to ensure that a defendant has "certain minimum contacts with [the forum state] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316. The Court need not determine whether due process has been satisfied if Michigan's long-arm statute requirements are not met. *Id.* (citing *Green v. Wilson*, 565 N.W.2d 813, 816-17 (Mich. 1997)).

Personal jurisdiction may be found either generally or specifically. *Miller*, 694 F.3d at 679 (citing *Air Prods. & Controls, Inc. v. Safetech Int'l Inc.*, 503 F.3d 544, 549-50 (6th Cir. 2007)). General jurisdiction depends on continuous and systematic contact with the forum state, so that the Court may exercise jurisdiction over any claims that a plaintiff may bring against the defendant. *Id.* (citing *Kerry Steel*, 106 F.3d at 149). General personal jurisdiction exists over a corporation only where a corporation is "at home" in the forum state. *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924 (2011); *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014). Specific jurisdiction, on the other hand, grants jurisdiction only to the extent that a claim arises out of or relates to the defendant's contacts in the forum state. *Id.* In the complaint, Plaintiff specifies that she is invoking the Court's general personal jurisdiction over Eastern. (Compl. ¶ 14, ECF No. 1, PageID.3.)

### A. Michigan's long-arm statute

Michigan's long-arm statute for general personal jurisdiction over a corporation provides that:

[t]he existence of any of the following relationships between a corporation and the

18

state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise general personal jurisdiction over the corporation and to enable the courts of record of this state to exercise general personal jurisdiction over a corporation and to enable such courts to render personal judgments against the corporation.

(1) Incorporation under the laws of this state.

(2) Consent, to the extent authorized by the consent and subject to the limitations provided in section 745.

(3) The carrying on of a continuous and systematic part of its general business within the state.

Mich. Comp. Laws § 600.711.

Eastern is a Virginia corporation, headquartered in Florida. (Def.'s Resp. 4, ECF No. 18, PageID.285.) Plaintiff alleges that Eastern directs its "advertisements, websites, and activities" to Michigan. (Compl. ¶ 14, ECF No. 1, PageID.3.) Plaintiff admits that Eastern is not incorporated under the laws of Michigan, *id.* at ¶ 3, nor has Eastern consented to the Court's jurisdiction. Thus, the only remaining avenue for general personal jurisdiction is the carrying on of a continuous and systematic part of Eastern's business in Michigan. But Eastern's business contacts with Michigan are not so "continuous and systematic" as to render it "at home" in Michigan. *Daimler*, 134 S. Ct. at 754. In fact, Eastern itself does not carry on any business in Michigan. (Rodgers Decl. ¶¶ 4, 9, ECF No. 18-1, PageID.295.)

Plaintiff also alleges that NFC is an alter ego of Eastern. She contends that NFC is a "corporate sham illusion and mere instrumentality" of Eastern and that Eastern "heavily influence[s] NFC and govern[s] and control[s] nearly every aspect of Narconon NFC's business activities." (Rodgers Decl. at ¶¶ 124-25, PageID.16.) When applying an alter-ego theory of personal jurisdiction in a diversity action, the Court must look to Michigan law. *Singh v. Daimler, AG*, 902 F. Supp. 2d

19

974, 981 (E.D. Mich. 2012) (citing *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008)). Michigan follows the "'well-recognized principle that separate corporate entities will be respected' and Michigan law presumes that, absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities." *Id.* (quoting *Seasword v. Hilti, Inc.*, 537 N.W.2d 221 (1995)). A subsidiary must become a "mere instrumentality" of the parent before its separate corporate existence will be disregarded. *Id.* Thus, "in order to find a parent corporation amenable to jurisdiction through the activities of a subsidiary, the subsidiary must be the parent's alter ego." *Id.* (citing *United Ins. Grp. Agency, Inc. v. Patterson*, No. 299631, 2011 WL 5067251, at *2 (Mich. Ct. App. Oct. 25, 2011) (internal citations and quotations omitted).

Facts tending to show the existence of an alter-ego relationship include: if the parent and subsidiary share principal offices, if they share board members or executives, if all of the parent's revenue comes from the subsidiary's sales, if all capital for the subsidiary is provided by the parent, if the subsidiary purchases supplies exclusively from the parent, if the subsidiary is seriously undercapitalized, if the parent regularly provided gratuitous services to the subsidiary, if the parent handled the subsidiary's payroll, if the parent directed the policies and decisions of the subsidiary, and if the parent considered the subsidiary's project to be its own. *Patterson*, 2011 WL 5067251, at *2 (citing *Seasword*, 537 N.W.2d at 221 and *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757 (1947)).

In order to make a *prima facie* showing for general personal jurisdiction, Plaintiff must show that Eastern "exerts so much control over [NFC] that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Singh*, 902 F. Supp. 2d at 982 (quoting *Indah v. United States Sec. & Exchg. Comm'n*, 661 F.3d 914, 921 (6th Cir. 2011) (internal citations and

quotations omitted)). But Eastern does not share principal offices with NFC; Eastern operates out of Florida and NFC operates out of Albion, Michigan. (Rodgers' Decl. ¶ 3; ECF No. 18-1, PageID.295; Compl. ¶¶ 3, 11, ECF No. 1, PageID.2-3.) The two companies do not share board members or executives. (Rodgers' Decl. at ¶ 6.) Other than receiving a licensing fee, Eastern does not derive any of its revenue from NFC. (*Id.* at ¶ 7.) Eastern also does not provide any of NFC's capital, and NFC does not purchase its supplies from Eastern. (*Id.*) In fact, Plaintiff admits that NFC receives its training materials from other companies. (Compl. ¶ 146, ECF No. 1, PageID.18.) Eastern does not regularly provide gratuitous services to NFC nor does it handle NFC's payroll. (Rodgers' Decl. ¶ 7, ECF No. 18-1, PageID.295.) These factors support a finding that NFC is not an alter ego of Eastern.

Although Eastern alleges that it "does not consider NFC's project to be its own," *id.*, Eastern's website refutes this claim. Its website lists NFC as a Michigan Rehabilitation Center under "Locations" and frequently uses the possessive "our" in reference to NFC. (Pl.'s Resp Ex. B, ECF No. 22-6, PageID.544-51.) The website also explains that "Narconon has had a residential drug rehab program in Michigan since 2003 and operates under the name of Narconon Freedom Drug Rehab Center." (*Id.* at PageID.551.) The website also describes that "[o]ur building was fully renovated in 2006," and to "[c]ontact *us* for more information on *ou*r Narconon center in Michigan[.]" (*Id.*) (emphasis added). This final factor supports a finding that NFC is an alter ego of Eastern. Nonetheless, Plaintiff has not made a *prima facie* showing that Eastern exerts so much control over NFC that the two entities are one in the same. At most, Plaintiff has shown that Eastern considers NFC as one of its drug rehabilitation centers and receives licensing fees from NFC for the use of the Narconon program materials. Thus, NFC is not Eastern's alter ego.

**B. Due process**

Because there is no personal jurisdiction for Defendant Eastern under Michigan's long-arm statute, the Court need not engage in a due process analysis. In any event, Plaintiff also fails to satisfy due-process requirements. Due process requires that a defendant have "certain minimum contacts with [the forum state] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken*, 311 U.S. at 463). Due process prevents a court from asserting general jurisdiction unless a corporation's affiliations with the forum state are so "'continuous and systematic' as to render [the corporation] essentially at home in the forum state." *Goodyear*, 564 U.S. at 919 (quoting *Int'l Shoe*, 326 U.S. at 318).

But a "corporation's 'continuous activity of some sorts within a state,' . . . 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" *Id.* at 927 (quoting *Int'l Shoe*, 326 U.S. at 318). For example, "mere purchases [in the forum state], even if occurring at regular intervals," are not enough to permit the exercise of general jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418 (1984). Plaintiff alleges that Eastern engages in continuous and systematic activity in Michigan through its "advertisements, websites, and activities," but does not provide any facts in support. Plaintiff attaches screen captures from NFC's website about the program to her complaint, but those do not mention Eastern at all. (Compl., Ex. 4, ECF No. 1-5, PageID.83-104.) In Plaintiff's response, she attaches screen captures of Eastern's website, which refers to NFC as one of its rehabilitation centers in Michigan, as discussed *infra*.

Even assuming that NFC is one of Eastern's rehabilitation centers, Eastern's website does not rise to the level of "systematic and continuous" activity in Michigan. *See Helicopteros*, 466

U.S. at 414-16.  Plaintiff argues that because of the website's "active and specific nature," Michigan

has general jurisdiction over Eastern.  (Pl.'s Resp. 8, ECF No. 22, PageID.422.)  But a website is

active only where "the defendant clearly does business over the Internet.  If the defendant enters into

contracts with residents of a foreign jurisdiction that involve knowing and repeated transmission of

computer files over the Internet, personal jurisdiction is proper."  *Clapper v. Freeman Marine*

*Equip., Inc.*, No. 211139, 2000 WL 33418414, at *9 (Mich. Ct. App. 2000) (*quoting Zippo Mfg. Co.*

*v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124-26 (W.D. Pa. 1997) (holding that where defendant

"repeatedly and consciously chose to process [the forum state] residents' applications" through its

website, the website was active); *see also Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883,

890 (6th Cir. 2002) (interpreting Michigan law).  Eastern's online material, by its very nature, can

be accessed across the world, but Eastern is no more benefitting from Michigan's laws than from the

laws of any other state.  Likewise, the website consists primarily of passively-posted information:

it advertises the program and provides basic contact information.  This does not rise to the level of

systematic and continuous activity in Michigan; the website does not allow for the entering into

contracts nor does it provide computer-file transmission.  In fact, Plaintiff did not enter into a

contract until she arrived at NFC in Michigan.  When Plaintiff reached out for more information on

the program, she spoke with an intake counselor at NFC, not Eastern.  Although there is information

about the Narconon program, Eastern's website is passive, not active.

Further, the paradigm all-purpose forums for general jurisdiction are a corporation's place

of incorporation and principal place of business.  *Daimler AG*, 134 S.Ct. at 749 (citing *Goodyear*,

564 U.S. at 927-28).  Eastern is not incorporated in Michigan nor is Michigan its principal place of

business.  Eastern's website, even with the information about NFC, does not make it so that Eastern

is considered "at home" in Michigan. Thus, Plaintiff has also failed to satisfy due process requirements for general personal jurisdiction over Eastern.

## IV.

In sum, Plaintiff's claims in her complaint are subject to the arbitration clause of the admission agreement that she signed with NFC. Her complaint alleges a breach of contract cause of action, so she cannot rely on the existence of the contract in her complaint yet defend against a Rule 12(b)(6) motion by arguing that there was no valid contract. In addition, Plaintiff has failed to make a *prima facie* showing of personal jurisdiction over Defendant Eastern.

Date: May 16, 2017                    /s/ Paul L. Maloney
                                      Paul L. Maloney
                                      United States District Judge